**TEXACO, INC., Appellant,**

v.

**Jerry MELTON, Jr., et al., Appellees.**

Court of Appeals of Kentucky.

Dec. 18, 1970.

As Modified on Denial of Rehearing
March 12, 1971.

Will Tom Wathen, Wathen & Wesley, Morganfield, for appellant.

J. D. Ruark, Morganfield, for appellees.

STEINFELD, Judge.

Appellant, Texaco, Inc., is the owner of the minerals under the surface of appellees Meltons' 789 acre farm which was formerly a part of Camp Breckinridge in Webster

County. Claiming that Texaco had damaged them in using their farm Meltons sued. Pursuant to a jury verdict, judgment was entered for $9,950.00. Texaco appeals. We reverse for a new trial.

Texaco acquired title to the minerals by a deed from the United States dated October 12, 1965, containing the following:

"Grantor does also grant to Grantee, its successors and assigns, the right to use any surface areas of the tracts of land hereinabove described which are reasonably necessary in order to use any and all methods of processes, whether now known or hereafter discovered or developed, to prospect for, explore for, mine, operate, produce, store, and remove the oil, gas, and all other minerals and mineral rights conveyed hereby, provided that the Grantee in the exercise of the rights and privileges granted by this paragraph shall be liable to Grantor or any future owner or owners of the surface areas for actual damages caused thereby to the surface areas, improvements, livestock, and growing crops, and provided further that nothing in this paragraph shall limit or be in derogation of any other rights of the owners of minerals and owners of the surface of lands under the laws of the State of Kentucky."

It drilled for oil and engaged in related operations until April 20, 1967, when it completed its last well.

On November 16, 1966, the Meltons and Roman Weis obtained title from the United States to the surface for $200 per acre, a total of $156,000. Their deed provided:

"1. Rights of the owner or owners of minerals and mineral rights, including the United States of America, to such use of the surface areas of the property conveyed hereby which is reasonably necessary to prospect, explore, mine, operate, produce, store and remove minerals, provided, however, that the owner or owners of the mineral rights shall be liable to the owner or owners of the surface area for actual damages caused thereby to the surface, improvements, livestock and growing crops. This provision shall not be in derogation of any other rights of the owners of minerals and the surface under the laws of the State of Kentucky. Nothing herein shall constitute or be construed as a waiver of the sovereign immunity and powers of the United States of America as the owner of the reserved coal and mining rights in and under the property hereby conveyed."

The deeds to Texaco, the Meltons and Weis also provided:

"Grantor also grants to Grantee, its successors and assigns, the nonexclusive right of use of existing roads located within the confines of the Camp Breckinridge Military Reservation, of which the tracts of land herein referred to are a part, for the purpose of ingress and egress. The roads referred to in this paragraph are shown on the map of the Military Reservation annexed hereto as Exhibit A."

On August 14, 1967, Weis conveyed his undivided interest to Meltons for $78,100. This suit was filed on March 12, 1968, and on July 26, 1968, Weis assigned to Meltons any rights he might have for "surface and crop damages."

The trial court ruled that no damages could be recovered in connection with drilling for the original well because it was completed before title was acquired by the Meltons, but that recovery could be had for loss of use of land due to Texaco's operation. After instructing the jury that Texaco "* * * had the right to use surface areas * * * which were reasonably necessary * * *" to extract minerals from the subsurface it permitted the jury to consider "* * * actual damages caused thereby to surface areas, improvements and growing crops by reason of

the exercising of the privilege * * *" it had. The verdict read:

"We, the jury, find the damages to be both permanent and temporary and find in the following amounts:

PERMANENT DAMAGES

| | |
|---|---|
| $179,682.20 | Fair Cash Value Before |
| 174,000.00 | Fair Cash Value After |
| 5,682.20 | Difference |

TEMPORARY DAMAGES

$4,267.80

/s/ Fred Creasey
Foreman"

Errors claimed relate to instructions, admission of certain evidence, and the amount of the award. Additionally appellant contends that error was committed " * * * in admitting the Weis assignment after the action (was) commenced" and in the failure of the court to fix " * * * a date of taking."

Texaco claims that the trial court erred in refusing to instruct the jury on its theory for measuring the permanent damages. It charges that " * * * contractual liability assumed by Texaco limits any claim by the landowners against Texaco for injury done the surface by Texaco to actual damages to those particular areas of land actually occupied and utilized by Texaco." It terms this the " * * * per acre theory as opposed to the before and after rule * * *". It concedes that the latter rule is generally applied in tort cases involving permanent damage to land and in condemnation actions. See Blue Diamond Coal Company v. Press Eversole, Ky., 253 S.W.2d 580 (1952) and Com., Dept. of Highways v. Sherrod, Ky., 367 S.W.2d 844 (1963). However it says that the rule " * * * cannot be invoked * * * where the parties have anticipated the damage and have by contract stipulated to a formula by which the damage may be ascertained." Cited to support this argument are O'Connor v. Great Lakes Pipe Line Co. (8th Cir.) 63 F.2d 523 (1933);

Fulkerson v. Great Lakes Pipe Line Co., 335 Mo. 1058, 75 S.W.2d 844 (1934); Shamblen v. Great Lakes Pipe Line Co., 158 Neb. 752, 64 N.W.2d 728 (1954) and Frankfort Oil Company v. Abrams, 159 Colo. 535, 413 P.2d 190 (1966). The Meltons say that the words in the deeds which Texaco contends are words of limitation were " * * * placed in the deed for the protection of the owner."

■ We find no language which we interpret as a formula for *measuring* the damage. On the other hand we agree that recovery must be limited to "actual damage" inflicted by Texaco to the "surface areas, improvements, livestock and growing crops" and for no other. To that extent the O'Connor, Fulkerson, Shamblen and Frankfort Oil Company cases support Texaco's position. However, we find nothing in them which convinces us that the "before and after rule" announced in United Fuel & Gas Company v. Rowe, Ky., 375 S.W.2d 264 (1964), which is traditional in this state is not the better way of assessing permanent damage such as we have here. We reaffirm that rule and reject the "per acre" theory.

■ Texaco had the right to use the surface. Horseshoe Coal Co. v. Fields, 207 Ky. 172, 268 S.W. 1078 (1925); 36 Am.Jur. 402, Mines and Minerals, § 177. Cf. Bailey-Ferguson Coal Co. v. Kennedy, 219 Ky. 819, 294 S.W. 467 (1927). Its rights, privileges and obligations were set out in its deed.

■ The evidence indicated that in exercising those rights it permanently injured many scattered areas but to attempt to value each of them seems impracticable if not impossible. It appears to us that the proper and most just approach to this difficult problem is to require the appraisers to recognize and consider that Texaco owned the mineral rights and had the privilege of using the surface subject to the obligation of paying for the damage inflicted on the surface owners in the exercise of that privilege. Cf. Davidson v.

Grigsby, Ky., 451 S.W.2d 632 (1970). The "before damage" valuation must be the worth of the real estate on the date of the first occurrence of actual damage after the date of deed to Meltons and Weis, but with Texaco's ownership and privilege being recognized. The "after damage" value likewise must be fixed with full consideration of these same factors. When that is done and the figures stated, the difference will be the depreciation for permanent *actual damages*. This procedure follows the theory expressed in Com., Dept. of Highways v. Sherrod, supra. Because temporary injury occurred it must be treated separately and eliminated in determining permanent damages and the appraisers must be so restricted. From the testimony we will relate it will be apparent that this course was not followed.

Jerry Melton first testified of the profit which would have been made by planting crops in the areas where Texaco was working and in which it had erected wells and tanks. He also told that timber of the value of $425 was destroyed and that 11¼ acres were damaged but that they were repaired for $250 per acre. The court ruled upon objection that this evidence could only be considered to show whether the damage done was temporary or permanent and not for recovery. Melton told what his group had paid for the farm and the costs of improvements. On cross-examination Texaco attempted to show rental value of the acres where production of crops was prohibited but the court ruled it could not do so. The testimony of this witness, in part, revealed that much of the damages claimed was based on inconvenience due to Texaco's activities, as distinguished from negligence, unreasonable use or injury to the property.

Without the order of witnesses being waived and without plaintiffs below having announced the completion of their proof, Texaco introduced its three witnesses. One stated that where wells were located corn could have been produced and that certain income was lost for that reason. He said another six acres were temporarily lost but he did not tell how until later where we find much confusion in his testimony. This witness gave before and after valuations of the farm as a whole. He was not permitted to assess rental value on some areas temporarily lost but did so by avowal.

The next witness for Texaco testified that the existence of wells damaged the land $250 per acre for those acres on which the wells existed. He told of the acres on which no crops could be produced and included acreage located in woods where he admitted crops could not be grown. He was permitted to tell of the rental value of lost acres. In appraising the entire farm he assumed there were no oil wells in existence, therefore, he said the "before value" was $173,580, but after the installations the value was reduced to $171,943. Additionally, he estimated the temporary and permanent damages together at a total of $2,273.

Another witness for defendant assigned permanent damage to the location of producing wells and the tank battery areas. He estimated that 7.35 acres were permanently damaged because of the existence of the wells and tanks and that "16 acre years" of damage was done to crops. The latter caused a loss of $700. He stated that "If there was no oil development there * * *" the value of the entire tract on April 20, 1967, would have been $250 per acre, or $197,359.50, but with the wells, tank batteries, access roads and other oil installations the value was reduced to $194,-822. He said the difference was $2,537 but corrected this to $1,837.50. He then explained that the permanent damage was $1,837.50 and temporary damage was $750, or a total of $2,537.50. He made two other corrections of his figures stating that the "after value" was $196,522 and then $195,000.

At this point the defendant rested and the plaintiffs announced they would produce several witnesses who would testify as to values. Claiming that such testimony

was not rebuttal the defendant objected but the objection was overruled.

Stanley Hoffman then testified for plaintiffs below. Over Texaco's objection he was permitted to state that with the oil wells on it on July 27, 1967, the entire property was worth $244,000 or $310 per acre. Without the wells the land, he said, would have been worth $276,000. Their existence caused permanent damage of $32,000. He explained "Well, in our opinion, or in my opinion the oil wells and the roadways, the pipelines and so forth, have damaged it that much from a prospective buyer because of the fact they cut fields up and you had several little tracts of land which would be inconvenient to operate and most of the farmers in the Camp Breckinridge area had large equipment, four-row planters, four-row drills, four-row corn pickers and everything, and there is so much damage in turning in a small field and if there were several roadways cut for the drilling and maintenance of the wells, and then, too, some cesspools out there that's still out there completely filled up and some damage to all wells, they look like oil has leaked out of an oil well. I know in one case it's run down through a gully-like then when you have rain it spreads on other lands and a prospective buyer of the farm takes all those things into consideration. And in my opinion it's damaged this property at least forty dollars per acre." At this point he said that you could not fix damage on a per acre basis, that you had to consider the farm as a whole, and the trial court agreed.

■ On cross-examination this witness was asked if he had considered temporary damages in reaching the values he had stated. An objection to the question was sustained. This was error as inquiry as to what the witness had considered was proper.

■ The record before us now is confusing. The index indicates that the next witness, Sam McElroy, was introduced by the plaintiffs and was examined by their

counsel but the record proper says he was called by the defendant and was examined by its counsel. This witness also stated the value which he based on an assumption that no wells existed. This he said would be $268,600 or $340 per acre, but because the wells were there the value was $300 per acre, a total of $237,000. This was objected to by counsel for Texaco. On cross-examination he was asked if he had separated permanent damage from temporary damage, but because of an objection he was not permitted to answer. This was error.

Two witnesses were produced by the Meltons but reviewing their short interrogations seems unnecessary. Then appeared for plaintiffs Elmon Whitledge, the last witness to testify, who stated that the existence of the wells and the oil operation decreased the value of the farm. He stated that without the wells and "without damage" the farm would be worth $345 per acre, a total of $272,205, but with them the value on July 1, 1969, was $300 per acre, a total of $236,700. He told that he had based his reduction in value on " * * * the inconvenience that these wells causes * * * ". He said he saw the erosion caused by diverted water and damage by escaping oil. He admitted that the value of the entire farm had increased from $156,000, the price Meltons and Weis paid, to $236,000 but he explained that this was due to the improvements the owners had made.

The oil company asserts that a grave error was committed in permitting the jury to return a verdict against it in the amount of $4,267.80 for temporary damage. In discussing this point we shall treat damages from unreasonable interference with the use of the surface as being included in the broad category of "temporary damages" although as later pointed out we think it must be treated separately in the instructions.

Although there was no evidence presented at the trial of actual physical damage to growing crops (excepting to some timber) a deposition indicated that there may have

been damage of this nature. Some proof indicated that there may have been unreasonable use by Texaco (in addition to permanent damage) occurring in the conduct of its operations, nevertheless, the evidence does not support the verdict for temporary damage. If there is another trial recovery may be permitted, the proof sustaining it, for actual physical damage to growing crops, (Commonwealth v. Masden, 295 Ky. 861, 175 S.W.2d 1004, 169 A.L.R. 101 (1943)) and for unreasonable interference with the use of the surface. Lindsey v. Wilson, Ky., 332 S.W.2d 641 (1960). The test to be applied in fixing the amount in the first instance would be the actual value of crops when and where they were destroyed and in the second instance the diminution in value of the use of the land.

In answer to Texaco's contention that fair rental is the correct measure of temporary damages we look to the past decisions of this court in which it was held that fair rental is the proper measure if the land be rented, but if the land is occupied by the owner then the diminution in value of use, if any, is the proper measure of damages. Toebbe v. City of Covington, 145 Ky. 763, 141 S.W. 421 (1911); City of Pikeville v. Riddle, 200 Ky. 395, 255 S.W. 63 (1923); and City of Jackson v. Haddix, 280 Ky. 436, 133 S.W.2d 547 (1939). Cf. Adams Construction Co. v. Bentley, Ky., 335 S. W.2d 912 (1960).

■ The oil company deliberately destroyed certain timber to enable it to conduct its operations. It argues that it is not liable for that destruction because timber was not mentioned in the deed unless it is included in the words "growing crops". We hold that the deed language was broad enough to indicate that Texaco must pay for the actual damage of timber wherefore it must compensate the Meltons for the fair, reasonable market value of the timber which it destroyed. Ford Lumber & Mfg. Co. v. Griggs, Ky., 118 S.W. 920 (1909). Courts have held that diminution in the value of the land is the measure when trees are destroyed (Blalock v. Atwood, 154 Ky.

394, 157 S.W. 694, 46 L.R.A.,N.S., 3 (1913)), nevertheless, here we feel that additional confusion would occur if this latter method were followed.

■ We do not agree with the contention of Texaco that a jury view of the land was vital to separate the temporary from the permanent damage. Viewing here is discretionary and the trial judge acted within his discretion. Illinois Basin Oil Association, Inc. v. Lynn, Ky., 425 S.W.2d 555 (1968).

■ Texaco claims the circuit court erred in permitting the landowners to prove permanent damages on rebuttal. This court in Brown v. Smiley, Ky., 428 S.W.2d 217 (1968), reiterated the long adhered to rule governing order of proof in a trial court. The rule as set forth in the opinion is:

"Discretion is granted to the trial court in regulating the order of proof. CR 43.02. In the absence of prejudice to the substantial rights of a complaining party the discretion exercised will not be a basis for reversal."

Although the reasons for allowing the evidence of permanent damages to be introduced in rebuttal are not disclosed, we are of the opinion that such irregularity was not prejudicial to the substantial rights of Texaco. On another trial this unusual procedure is unlikely to recur and should be avoided if possible. The problems facing both court and jury in this case are manifold, therefore, orderly procedure is most desirable.

■ Texaco further contends that the assignment Weis made to Meltons transferring any right he had to collect damages was ineffective to the extent that Meltons are entitled to only one-half of the damages claimed. Several cases are cited to support the principle that a subsequent purchaser of real property is not entitled to recover for permanent damages incurred by the previous owner. The theory expressed was that the subsequent purchaser has already

been compensated because of a presumption that the property was purchased at a reduced rate. Hughes v. General Electric Light & Power Co., 107 Ky. 485, 54 S.W. 723 (1900); Louisville & N. R. Co. v. Lambert, Ky., 110 S.W. 305 (1908); City of Richmond v. Gentry, 136 Ky. 319, 124 S.W. 337 (1910) and Commonwealth v. Kelley, 314 Ky. 581, 236 S.W.2d 695 (1951). There was no indication in the cases cited above that any such assignment or intention to assign existed. We have heretofore approved assignments of contractual rights. Grundy v. Manchester Insurance & Indemnity Co., Ky., 425 S.W.2d 735 (1968) and Terrell v. Western Casualty & Surety Co., Ky., 427 S.W.2d 825 (1968). Also see 6 C.J.S. Assignments § 31, p. 1080. The assignment, being made after the commencement of the action, was not prejudicial to the rights of Texaco.

Texaco contends the circuit court also erred by its failure to fix a "date of taking". While it is true that fixing a "date of taking" is required in an eminent domain case it does not follow that fixing one is necessary here for there was no "taking" of the land by Texaco. The evidence will disclose when the temporary and permanent damages, if any, occurred.

Finally we come to Texaco's objection to the circuit court's instruction pertaining to damages to the "tank trails." The instruction read:

"If you find from the evidence that the tank trails on said property and referred to in the evidence, as a result of their physical characteristics, are roads then no award for their use in and of itself alone can be made against the defendant, Texaco, Inc.; but if you find from such evidence that the tank trails are not roads and if you further believe that the plaintiffs suffered actual damages by their use then and in that event you may include such actual damages in your award."

There was an issue of fact surrounding the use of these "tank trails". Texaco claims these trails are a part of the road network that it is entitled to use under its deed. Meltons argue that they are not a part of this road network. The evidence was such that the issue was properly submitted to the jury.

If a new trial is had and the evidence is substantially the same, the jury should be instructed generally as follows:

1. The defendant, Texaco Company, Inc., had the right to use any surface areas of Meltons' land which were reasonably necessary in order to prospect for, store and remove the oil and gas, but is obliged to pay Meltons for any actual damages which it caused by injuring or occupying the surface areas, improvements, timber and growing crops.

2. Damage of a permanent nature is that which prevents the damaged property from being substantially restored to its previous condition at a reasonable cost. Damage of a temporary nature is that which does not prevent the damaged property from being substantially restored to its previous condition at a reasonable cost. The timber and crops destroyed will not be considered by you in either of those categories but you will follow Instructions numbers 6 and 7 with respect to them.

3. If you find from the evidence that the tank trails on said property and referred to in the evidence, as a result of their physical characteristics, are roads then no award for their use in and of itself alone can be made against the defendant, Texaco, Inc.

4. For the permanent damage caused to the surface areas of the plaintiffs' land by the defendant in the exercise of its right to use the surface areas you will award plaintiffs such sum as you believe from the evidence is the diminution in the market value of plaintiffs' interest in the land which was proximately caused and brought about by injury done by defendant. This is to be de-

termined by the difference in the fair market value of the plaintiffs' interest in the land immediately before and immediately after the permanent damages occurred.

5. If you believe from the evidence that the defendant unreasonably interfered with plaintiffs' use of the surface of their land temporarily you will award plaintiffs such sum as you believe from the evidence will compensate plaintiffs for the fair value of the loss of use thereof for the period or periods of such interference.

6. If you believe from the evidence that the defendant actually damaged growing crops you will award to plaintiffs such amount as you believe from the evidence will compensate plaintiffs for the fair reasonable market value of the crops when and where they were actually damaged.

7. If you believe from the evidence that the defendant actually damaged growing timber you will award to plaintiffs such amount as you believe from the evidence will compensate plaintiffs for the fair reasonable market value of the timber when and where it was actually damaged.

8. If you believe from the evidence that in the exercise of its rights the defendant caused any actual damage of a temporary nature (as defined in Instruction number 2) to the surface areas of the land in question, *other than* damage to crops and timber and temporary interference with the plaintiffs' use of the surface as covered by Instructions 5, 6 and 7, you will award plaintiffs such sum as you believe from the evidence will compensate them for the reasonable cost of restoring the surface areas to substantially the same condition in which it would have been except for such temporary damage.

9. You will in your verdict specify separately your awards, if any, for:

A. Permanent damage.

B. Temporary loss of use.

C. Crops.

D. Timber.

E. Temporary damage *other than* crops, timber, and loss of use.

You will set out the amount for each, if any, and if there is none you will so indicate. In no event will your total award, if any, exceed $9,950, the amount demanded in the complaint.

10. Nine or more of you may return a verdict. If less than twelve agree, those agreeing must sign the verdict. If all twelve agree, then only your foreman, whom you will elect, need sign the verdict.

The court may find it desirable to submit form verdicts leaving blank spaces for the jurors to fill in.

Other assignments of error are presented, however, these matters are unlikely to occur at a new trial. We deem it unnecessary to pass on them and they are specifically reserved.

The judgment is reversed for a new trial in conformity with this opinion.

MILLIKEN, NEIKIRK, OSBORNE and PALMORE, JJ., concur.

HILL, C. J., dissents to so much of the opinion as permits recovery for Texaco's reasonable use of the surface areas in exercising its rights and privileges under its deed.

REED, J., did not sit.